## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 16-** |
| **v.** | : | **DATE FILED:** |
| **ALAN SUMMERS** | : | **VIOLATIONS:** |
| **AZAD KHAN** | | **21 U.S.C. § 846 (conspiracy to distribute** |
| **KEYHOSROW PARSIA** | : | **controlled substances – 1 count)** |
| | : | **18 U.S.C. § 1349 (conspiracy to commit** |
| | | **health care fraud- 1 count)** |
| | : | **21 U.S.C. § 841(a)(1) (distribution of** |
| | : | **controlled substances – 11 counts)** |
| | | **18 U.S.C. § 1956 (money laundering – 2** |
| | : | **counts)** |
| | | **18 U.S.C. § 1347 (health care fraud – 2** |
| | : | **count)** |
| | | **18 U.S.C. § 2 (aiding and abetting)** |
| | : | **Notices of forfeiture** |

## INDICTMENT

## COUNT ONE

**THE GRAND JURY CHARGES THAT:**

At all times material to this indictment:

## BACKGROUND

### A. Prescriptions for Controlled Substances

1. The Controlled Substances Act governs the manufacture, distribution, and dispensing of controlled substances in the United States. Under the Controlled Substances Act, there are five schedules of controlled substances, Schedules I, II, III, IV, and V. Controlled substances are scheduled into these levels based upon their potential for abuse, among other

things.   Buprenorphine is a Schedule III controlled substance.   Clonazepam is a Schedule IV controlled substance.

2.     Title 21, United States Code, Section 841(a) (1), provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance."

3.     Title 21, United States Code, Section 802(10), provides that the term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for delivery.

4.     Title 21, United States Code, Section 821, provides that "[t]he Attorney General [of the United States] is authorized to promulgate rules and regulations relating to the registration and control of the manufacture, distribution and dispensing of controlled substances."

5.     The Attorney General of the United States has exercised his rulemaking authority regarding the dispensing of controlled substances through the promulgation of Title 21, Code of Federal Regulations, Section 1306.04, governing the issuance of prescriptions, which provides, among other things, that a prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.   Moreover, an order purporting to be a prescription issued not in the usual course of professional treatment is not a prescription within the meaning and intent of section 309 of the Act [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as

well as the person issuing it, shall be subject to the penalties provided for violations of the law

relating to controlled substances.

6.      The Pennsylvania Code of Professional and Vocational Standards, Title 49,

Chapter 16.92, defines the authority of physicians licensed by the Commonwealth of Pennsylvania

to prescribe or dispense controlled substances.   Chapter 16.92 provides in pertinent part:

(a)      A person licensed to practice medicine and surgery in this
Commonwealth or otherwise licensed or regulated by the Board, when prescribing,
administering or dispensing controlled substances, shall carry out, or cause to be
carried out, the following minimum standards:

(1)      Initial medical history and physical examination....
[B]efore commencing treatment that involves prescribing, administering or
dispensing a controlled substance, an initial medical history shall be taken and an
initial examination shall be conducted unless emergency circumstances justify
otherwise.   Alternatively, medical history and physical examination information
recorded by another health care provider may be considered if the medical history
was taken and the physical examination was conducted within the immediately
preceding thirty days.   The physical examination shall include an evaluation of the
heart, lungs, blood pressure and body functions that relate to the patient's specific
complaint.

(2)      Reevaluations.   Among the factors to be considered in
determining the number and the frequency of follow-up evaluations that should be
recommended to the patient are the condition diagnosed, the controlled substance
involved, expected results and possible side effects.   For chronic conditions,
periodic follow-up evaluations shall be recommended to monitor the effectiveness
of the controlled substance in achieving the intended results.

(3)      Patient counseling.   Appropriate counseling shall be given
to the patient regarding the condition diagnosed and the controlled substance
prescribed, administered or dispensed.   Unless the patient is in an inpatient care
setting, the patient shall be specifically counseled about dosage levels, instructions
for use, frequency and duration of use and possible side effects.

(4)      Medical Records.   [C]ertain information shall be recorded
in the patient's medical record on each occasion when a controlled substance is
prescribed, administered or dispensed.   This information shall include the name of
the controlled substance, its strength, the quantity and the date it was prescribed,
administered or dispensed to a patient.   The medical record shall also include a
specification of the symptoms observed and reported, the diagnosis of the condition
for which the controlled substance is being given and the directions given to the

patient for the use of the controlled substance.   If the same controlled substance continues to be prescribed, administered or dispensed, the medical record shall reflect changes in the symptoms observed and reported, in the diagnosis of the condition for which the controlled substance is being given and in the directions given to the patient.

### B.     Medications

7.       Suboxone is a brand name for a drug used to treat opiate addiction.   Suboxone contains a mixture of buprenorphine and naloxone.   Buprenorphine is a Schedule III controlled substance.   However, Suboxone can be used recreationally by crushing and snorting to produce a "high".   Suboxone also can be dissolved and injected intravenously for a similar euphoric effect. Suboxone can be used by long-time heroin addicts to increase the euphoric effects of heroin. Over time, the euphoric effect of heroin diminishes as the users' tolerance level increases.   For some longtime users, taking heroin only makes them feel "normal" – it does not produce the rush or the euphoric effect they experienced when they began using heroin.   One strategy to reproduce that euphoric effect is to take Suboxone for a few weeks and abstain from heroin.   This reduces the user's tolerance of heroin.   When the user then takes heroin again, the euphoric effect is magnified.   Some users call this strategy seeking a "virgin high" as a way to describe the euphoric effect of the high as comparable to the rush they felt when they first tried heroin.   This strategy is highly dangerous and can easily lead to overdose and death.

8.       Klonopin is a brand name of the drug clonazepam. Clonazepam is in the benzodiazepine class of tranquilizers.   Klonopin is typically orally ingested to treat anxiety and seizure disorders by altering certain chemicals in the brain.   When used recreationally, typically in combination with other drugs or alcohol, Klonopin can create euphoria or drowsiness depending on the methods used.   Because of the way it alters the brain, Klonopin may also cause suicidal or

homicidal thoughts in some people, and it may cause the user to engage in risky or dangerous behaviors.

9.      In recent years, law enforcement has seen a large increase in the recreational use of prescription medicine such as Suboxone and Klonopin.   Suboxone is typically sold on the street for $10 to $15 per dose.   Klonopin is typically sold on the street for $2 to $5 per pill.

10.     The combination of taking large doses of Suboxone and Klonopin is highly dangerous.   Suboxone is an opioid drug which slows a person's breathing, especially in larger doses.   Klonopin can cause a person to be drowsy.   Taking these drugs in combination, especially in large doses or by users not following the appropriate dosages, can result in death if a person stops breathing while asleep or incapacitated.

### C.      DATA-Waived Physicians

11.     Most drug treatment centers were highly regulated by federal and state authorities. However, these regulations impacted the ability of family doctors to treat their regular patients who acquired a substance abuse problem.   For this reason, on October 17, 2000, Congress passed the Drug Addiction Treatment Act (DATA) which permits qualified physicians to treat a limited number of drug addicts with narcotic controlled substances which have been approved by the Food and Drug Administration (FDA) for that indication.   The legislation waived the requirement for obtaining a separate Drug Enforcement Administration (DEA) registration as a Narcotic Treatment Program (NTP) for qualified physicians administering, dispensing, and prescribing these specific FDA approved controlled substances.

12.     Physicians registered with the DEA as practitioners who apply and were qualified pursuant to DATA were issued a waiver and were authorized to conduct maintenance and detoxification treatment using specifically approved schedule III, IV, or V narcotic medications.

DATA waivers are only granted to qualified physicians.   Physicians can initially apply to treat 30 patients and can later apply to treat as many as 100 patients.   In order to receive a DATA waiver, physicians must attend a training course which educates them on the dangers involved in treating drug addicts.

        **D.**     **SAMHSA Training**

13.    In order to become a DATA-waived physician, each doctor had to become qualified.   One way to become qualified was to take a course by the U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration (SAMHSA). The SAMHSA training materials provided each DATA-waived physician with an overview of DATA and buprenorphine treatment generally.   The training materials listed the side-effects of buprenorphine treatment including nausea, vomiting, constipation, sedation, and liver problems.

14.    The SAMHSA training materials specifically discussed the risk of diversion and misuse.   DATA-waived physicians were taught that there were four high risk groups for diversion: (1) patients physically dependent on opioids, (2) patients prescribed opioids, (3) patients maintained on buprenorphine/naloxone, and (4) patients abusing, but not physically dependent on opioids.   Physicians were taught the specific ways in which patients might abuse buprenorphine.   Due to the risk of diversion, physicians were taught that the induction required closely supervised clinical monitoring.

15.    The SAMHSA training materials provided physicians with specific instructions for the induction stage.   The physicians were taught to instruct patients to abstain from any opioid use for 12 hours prior so they were in mild to moderate withdrawal at the time of the first buprenorphine dose.   The physicians were to track and document the patients' withdrawal scale. Axiomatically, the training materials specifically provide that if the physician did not observe any

withdrawal symptoms, the physician should instruct the patient to wait in the office until they appear or return the next day.

16.     The SAMHSA training materials instructed physicians that the first dose of buprenorphine should only be 2 to 4 milligrams.   The physicians must then monitor the patient for up to 2 hours after first dose.   If withdrawal symptoms occur, the physician could give another dose of buprenorphine or other medications to ease withdrawal symptoms.   The SAMHSA training materials stated that no more than 8 milligrams of buprenorphine should be administered on the first day.   For patients who are not physically dependent on opioids, the induction dose should be at the lower end of the spectrum, typically 2 milligrams of buprenorphine.

17.     The SAMHSA training materials also described how physicians should interview new patients.   The physicians should ask the patients about their history of drug use including the amount, frequency, and route.   The physicians should inquire about the patients' mental health history, socio-economic conditions, and any pertinent family history.   The physicians should physically examine the patient for signs of illegal drug use.   The physicians should discuss prior attempts to abstain or seek treatment and assess whether the patients are abusing other substances. The physicians should discuss with their patient the consequences of their drug use, such as medical, family, employment, legal, and psychiatric.   The physicians should review the Diagnostic and Statistical Manual of Mental Disorders criteria in order to diagnose a patient with opioid dependence.   The SAMHSA training materials stressed the importance of both a physical examination and a mental health examination of each patient.

18.     The SAMHSA training materials further provide that patients should then return to the office on the second day for assessment and proper dosing.   The physician should adjust the dosing according to the patient's needs.   The physician should adjust the dosage by 2 to 4

milligrams to find the correct dosage for each patient.   The average daily dose should be somewhere between 12 and 16 milligrams.

19.     The SAMHSA training materials also discussed the fact that the majority of new patients express symptoms of anxiety and depression.   The training materials indicate that these were common symptoms of opioid dependence and that the "symptoms often resolve within a few days" of substance abuse treatment.   The materials specifically warned against prescribing benzodiazepines (Klonopin) due to the risk of abuse and possible dangerous interactions with the buprenorphine.

20.     The SAMHSA training materials also provided a specific training module on urine testing.   The training materials stated that the clinical rationale for urine drug testing is based on the understanding that drug abuse is a chronic disorder and that relapse in drug use can, and often does, occur, especially early in the treatment process.   Urine testing provides an objective means for determining if drug use is occurring.   Urine testing should be viewed as an integral part of the initial evaluation (as a means to confirm opioid use) and as part of ongoing evaluation and treatment.   Urine testing should be viewed as a means for helping the physician to help the patient.   Testing is not meant to "catch" the patient, and a positive test result should not simply lead to discharge from treatment.   Ideally, urine specimens should be collected under monitored conditions because opioid-dependent persons may attempt to give adulterated or substituted specimens.   Urine should be collected in a room where samples cannot be diluted or otherwise adulterated and where patients are not permitted to bring briefcases, backpacks, purses, or containers of any sort.   Direct observation of the collection should be done by a same sex staff member.   If not observed directly, consider using collection cups with built-in temperature-sensitive strips to minimize the possibility of false or adulterated urine specimens.

Alternately, the pH and specific gravity of samples can be checked (to ensure that samples have not been diluted).   If tampering with samples is suspected and observed collection is not possible, use another method of verifying the sample.

    **E.    Manufacturer's Guidelines**

    21.    The manufacturer of Suboxone also provided guidelines for physicians to follow when prescribing Suboxone.   In the prescribing information, the manufacturer stated that the range of effective dose is 4 mgs to 24 mgs.   The manufacturer suggested that the Suboxone dose should be progressively adjusted by 2 mg to a level that holds the patient in treatment and suppresses opioid withdrawal signs and symptoms.   The manufacturer stated that Suboxone treatment should be initiated with supervised administration progressing to unsupervised administration as to the patient's clinical stability permits.   Patients should be seen weekly during the first month of treatment.   Periodic assessment is necessary to determine compliance with the dosing regimen, effectiveness of treatment plan, and overall patient progress.

    22.    The manufacturer provided the following warnings about Suboxone:

    a.    Buprenorphine can be abused in a similar manner to other opioids. Clinical monitoring appropriate to the patient's level of stability is essential. Multiple refills should not be prescribed early in treatment or without appropriate patient follow-up visits.

    b.    Significant respiratory depression and death have occurred in association with buprenorphine, particularly when taken in combination with benzodiazepines (Klonopin) or other central nervous system depressants (such as alcohol).

    c.        Chronic administration of Suboxone produces opioid-type physical dependence.

    d.        Physicians should monitor liver function tests prior to initiation and during treatment and evaluate suspected hepatic events.

    e.        Physicians should caution patients about the risk of driving or operating hazardous machinery.

    f.        Patients who are opioid naïve can die from as little as a 2 mg dose of Suboxone.

23.     The manufacturer specifically warned physicians of the risk that Suboxone may be abused and is subject to criminal diversion.   The manufacturer further stated that if the patients cannot abstain from illicit drug and alcohol use, the physician should re-evaluate the appropriateness of the Suboxone treatment.   The manufacturer stated that patients who continue to misuse, abuse, or divert Suboxone should be provided with or referred to more intensive and structured treatment.

24.     The manufacturer also advised physicians to watch for adverse reactions to Suboxone.   The most common adverse reactions include oral hypoesthesia (numbness), glossodynia (burning), oral mucosal erythema (reddening), headache, nausea, vomiting, hyperhidrosis (excess sweating), elevated brain/spinal fluid pressure, and constipation.   The manufacturer stated that long-term side effects included analgesia (loss of ability to feel pain), sedation, miosis (excessive restriction of the pupil of the eye), and respiratory depression.   The manufacturer stated that their research found that the higher the dose of Suboxone, the higher the opioid-like effects.   The manufacturer noted that the common symptoms of withdrawal included insomnia, pain, and peripheral edema (accumulation of fluid).   The manufacturer stated that

physicians should monitor patients for over or under dosing.   The manufacturer materials also stated that it is essential that the patient receive ongoing counseling and emotional support.

25.     Finally, the manufacturer provided specific warnings for certain types of patients. The manufacturer noted that physicians should use caution in prescribing Suboxone for patients receiving benzodiazepines [Klonopin] or other central nervous system depressants.   The manufacturer stated that physicians must warn patients against concomitant self-administration/misuse.   The manufacturer warned that Suboxone is not indicated for use during pregnancy and warned that breast feeding is not advised while taking Suboxone because buprenorphine passes into the mother's milk.   The manufacturer instructed doctors to be cautious when prescribing Suboxone to patients with liver dysfunction and to elderly or debilitated patients.

### E.     Roles of the Defendants

26.     Defendant ALAN SUMMERS was registered under the provisions of the Controlled Substances Act, U.S.C. § 822(2) and 21 U.S.C. § 823(g) et seq. as a practitioner and was assigned DEA Registration Number AS6047410 for the purpose of handling controlled substances in Schedules II through V.   Defendant SUMMERS was licensed by the Commonwealth of Pennsylvania to practice medicine until his license was revoked in 2014 after DEA executed a search warrant at his office.

27.     Defendant ALAN SUMMERS sometimes operated under the business name "NASAPT" (National Association for Substance Abuse-Prevention & Treatment).   NASAPT is a limited liability company controlled by defendant SUMMERS.   Defendant SUMMERS nominally operated a substance abuse treatment clinic which prescribed Suboxone and Klonopin. His clinic was initially opened at 1337 Snyder Avenue, Philadelphia, Pennsylvania.   The clinic later moved to 2300 South Broad Street, Philadelphia, Pennsylvania.   Defendant SUMMERS's

clinic was a controlled premise within the meaning of 21 U.S.C. § 880(a)(1) and (2), and 21 C.F.R. § 1316.02(c)(1) and (2).   Defendant SUMMERS was required to keep complete and accurate records of all controlled substances received, sold, delivered, dispensed, or otherwise disposed of by him pursuant to 21 U.S.C. § 827 and 21 C.F.R. § 1304.01 et seq.   During the course of the conspiracy, defendant SUMMERS employed approximately thirty doctors working at his clinic.

28.     On September 19, 2007, defendant ALAN SUMMERS requested a DATA waiver and was issued UIN XS6047410 by DEA, authorizing him to administer, dispense and prescribe Schedule III narcotic controlled substances, namely buprenorphine drug products, for use in the maintenance and detoxification treatment of his patients.   This meant that he had the authority to administer, dispense, and prescribe buprenorphine products up to 30 patients each for the purpose of treating any drug addiction that they might have.   On October 16, 2008, defendant SUMMERS requested and was authorized by DEA to administer, dispense, and prescribe buprenorphine products up to 100 patients each for the purpose of treating any drug addiction that they might have.

29.     Defendant AZAD KHAN was a physician licensed to practice medicine by the Commonwealth of Pennsylvania, specializing in internal medicine.   Defendant KHAN took the training course to be authorized to prescribe Suboxone for opiate addictions.   Defendant KHAN worked at defendant ALAN SUMMERS's clinic at 2300 South Broad Street in 2013 and 2014.

30.     Defendant KEYHOSROW PARSIA was a physician licensed to practice medicine by the Commonwealth of Pennsylvania, specializing in psychiatry.   On June 11, 2005, defendant PARSIA completed the training course to be authorized to prescribe Suboxone for opiate addictions.   Defendant PARSIA worked at defendant ALAN SUMMERS's clinic at 2300 South Broad Street in 2013 and 2014.   Defendant PARSIA worked for defendant SUMMERS on a

profit sharing arrangement and received approximately 40% of the gross receipts for the prescriptions he signed.

## THE CONSPIRACY

31.     From on or about January 1, 2011 through the date of this indictment, in the Eastern District of Pennsylvania, defendants

**ALAN SUMMERS,**
**AZAD KHAN, and**
**KEYHOSROW PARSIA**

conspired and agreed, together and with and others known and unknown to the grand jury, to knowingly and intentionally distribute and dispense, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of buprenorphine, commonly known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, commonly known as Klonopin, a Schedule IV controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2).

## MANNER AND MEANS

32.     Defendant ALAN SUMMERS ran a clinic in Philadelphia which nominally provided substance abuse treatment to drug addicts.   In reality, defendant SUMMERS and the other doctors who worked at his clinic, including defendants AZAD KHAN and KEYHOSROW PARSIA, sold prescriptions for controlled substances to drug dealers and drug addicts in exchange for cash payments and performed little or no medical or mental health treatment.   Defendant SUMMERS did not perform medical or mental health examinations of his customers as required by law.   Virtually every customer who visited defendant SUMMERS's clinic received the

-13-

maximum daily doses of Suboxone and Klonopin regardless of the customer's medical or mental health history.

33.     Defendant ALAN SUMMERS's clinic usually sold controlled substances to more than 1,000 customers per month.   Under the terms of his DATA-waiver, defendant SUMMERS was legally permitted to provide substance abuse treatment to no more than 100 patients. Defendant SUMMERS typically employed around 10 doctors at his clinic to assist him in dispensing the controlled substances.   These doctors included defendants AZAD KHAN and KEYHOSROW PARSIA.   Neither defendants SUMMERS, KHAN, nor PARSIA conducted medical examinations or mental health examinations of the customers prior to prescribing controlled substances.

34.     Defendants ALAN SUMMERS, AZAD KHAN, and KEYHOSROW PARSIA failed to follow the standard of care in purportedly treating substance abuse by:

    a.     Failing to perform medical examinations;

    b.     Failing to perform mental health examinations;

    c.     Failing to obtain adequate medical and mental health histories from patients;

    d.     Failing to ensure that patients being prescribed Suboxone were not pregnant;

    e.     Failing to follow the Diagnostic and Statistical Manual of Mental Disorders criteria in order to diagnose a patient with opioid dependence;

    f.     Failing to properly assess patients for other substance abuse;

    g.     Failing to administer proper urine and blood tests to ensure the suitability of treatment;

h.  Failing to follow proper procedures in collecting urine samples;

i.  Ignoring the results of urine tests;

j.  Failing to observe opioid withdrawal symptoms before prescribing Suboxone;

k.  Failing to follow proper Suboxone induction treatment procedures;

l.  Failing to induce withdrawals symptoms before administering Suboxone;

m.  Failing to properly monitor patients after prescribing Suboxone;

n.  Failing to titrate the effective dose of Suboxone for each patient;

o.  Prescribing more Suboxone than medically necessary;

p.  Indiscriminately prescribing Klonopin to patients when not medically necessary;

q.  Failing to counsel patients on the dangers of taking Suboxone and Klonopin together;

r.  Falsifying medical records to justify prescriptions of Suboxone and Klonopin;

s.  Failing to provide licensed mental health professionals to patients;

t.  Failing to refer patients to more intensive in-patient or out-patient mental health treatment or substance abuse treatment when medically necessary;

u.  Ignoring evidence of diversion of the prescriptions; and

v.  Failing to taper doses of Suboxone and Klonopin over time.

35.  As a result, defendant ALAN SUMMERS's clinic became well-known to drug dealers and drug addicts in Philadelphia and the surrounding area.   Drug dealers and drug addicts from as far away as Cape May, New Jersey went to defendant SUMMERS's clinic to obtain

prescriptions for massive doses of Suboxone and Klonopin.   The drug dealers sold the Suboxone and Klonopin for a profit.   The drug addicts sold the Suboxone and Klonopin in order to buy heroin or other controlled substances.   Drug dealers openly sold controlled substances inside defendant SUMMERS's clinic and on the street immediately outside.   Defendants SUMMERS, AZAD KHAN, KEYHOSROW PARSIA, and other doctors working at defendant SUMMERS's clinic routinely ignored drug tests which showed that their customers' urine was negative was for the controlled substances which they had prescribed and positive for other controlled substances. These urine tests were an unmistakable sign that defendant SUMMERS's customers were diverting and selling the prescribed controlled substances.

36.     Customers to defendant ALAN SUMMERS's clinic paid for the amount of drugs they wished to receive.   For a week's prescription of Suboxone and Klonopin, customers paid $50.   For two weeks' worth of Suboxone and Klonopin, customers paid $100.   For a month's supply, customers paid $200.   The medical standard of care, or lack thereof, at defendant SUMMERS's clinic did not change depending on the amount a customer paid.   Defendant SUMMERS's clinic only accepted U.S. currency as payment.   In other words, the customers to defendant SUMMERS's clinic paid for prescriptions, not any medical or mental health treatment.

37.     Defendant ALAN SUMMERS had a robust system for recruiting new customers to his clinic and a rewards system for referrals.   Defendant SUMMERS regularly handed out referral cards to customers and promised them a $50 discount off the customer's next prescription per referral.   Thus, a customer who referred four new customers received prescriptions for a month's supply of Suboxone and Klonopin without charge from defendant SUMMERS's clinic. Defendant SUMMERS also organized, or attempted to organize, transportation for customers to visit his clinic.

38.     Between approximately August 2012 and approximately August 2014, defendant ALAN SUMMERS personally prescribed approximately 320,000 Suboxone doses and approximately 609,000 Klonopin doses, defendant AZAD KHAN prescribed approximately 110,000 Suboxone doses and approximately 15,000 Klonopin doses, and defendant KEYHOSROW PARSIA prescribed approximately 159,000 Suboxone doses and approximately 155,000 Klonopin doses.   During the course of the conspiracy, defendant SUMMERS and the other doctors working at his clinic illegally prescribed an estimated 2.5 million Suboxone doses and 2.5 million Klonopin doses.

39.     Defendant ALAN SUMMERS typically sold controlled substances to approximately 1,000 customers per month each paying up to $200 per month.   Defendant SUMMERS reaped substantial profits from the illegal sale of controlled substances.   In 2011, defendant SUMMERS deposited approximately $743,210 in U.S. currency into his bank accounts from the illegal sale of controlled substances.   In 2012, defendant SUMMERS deposited approximately $1,054,067.73 in U.S. currency into his bank accounts from the illegal sale of controlled substances.   In 2013, defendant SUMMERS deposited approximately $1,536,937.76 in U.S. currency into his bank accounts from the illegal sale of controlled substances.   In 2014, defendant SUMMERS deposited approximately $802,081 in U.S. currency into his bank accounts from the illegal sale of controlled substances.   From 2011 to 2014, defendant SUMMERS deposited a total of approximately $5,033,187.49 in cash proceeds from the illegal sale of controlled substances.

40.     Defendant ALAN SUMMERS used part of the proceeds from the illegal sale of controlled substances to run his illegal enterprise by paying doctors to sign prescriptions for controlled substances outside the usual course of professional practice and not for a legitimate

medical purpose.   Defendant SUMMERS typically employed approximately ten doctors to sign

prescriptions for his customers.   Defendant SUMMERS stated that these doctors received

approximately 30% of the gross receipts from his clinic.   Between 2012 and 2014, defendant

SUMMERS paid defendant KEYHOSROW PARSIA approximately $153,193 and paid defendant

AZAD KHAN approximately $147,028 to sign fraudulent prescriptions.   Defendant SUMMERS

used additional funds to pay for other doctors to sign fraudulent prescriptions.   These payments

came from the proceeds of defendant SUMMERS's illegal drug trafficking activities.

41.     Defendant ALAN SUMMERS also used or intended to use part of the proceeds

from the illegal sale of controlled substances to re-invest back into his business in an attempt to

illegally sell and ultimately profit from the sale of controlled substances to a larger customer base,

as he described in his "Ten Year Financial Plan."   Defendant SUMMERS stated that he had

"invested about "$60,000 in business cards and the refurbishing of a new office.   We have

probably invested $10,000 this year, but have remain[ed] stagnant in growth due to saturation of

our market."   Defendant SUMMERS planned "$50,000 per year in growth ventures" in order to

"double the gross [revenues] every seven years."   Defendant SUMMERS noted that although "we

have 1,000 patients, each patient stays an average of 3 months."

42.     In order to generate new customers and new revenue, defendant SUMMERS

planned, as he described in his "Ten Year Financial Plan," to create a "physician-based pharmacy"

to "dispense medications and bill the insurance companies."   Defendant SUMMERS also planned

to open satellite offices in Upper Darby, Pennsylvania and elsewhere where he hoped to obtain

1,600 new customers.   Defendant SUMMERS planned to spend $10,000 from the proceeds of his

illegal drug trafficking activities to open one satellite office.   Defendant SUMMERS planned to

hire a team to attend Narcotics Anonymous and Alcoholics Anonymous meetings to "give out

business cards and other promotional material to people entering and leaving the meetings."
Defendant SUMMERS planned to hire a videographer to create videos to sell to "patients and
graduates."   Defendant SUMMERS also planned to spend "$100,000 to develop this venture; but,
since our audience is potentially in the millions, we should be able to recoup the costs plus
additional working capital in time."

43.     During the course of the investigation, DEA sent healthy undercover law
enforcement officers and other agents posing as customers inside defendant ALAN SUMMERS's
clinic.   All were diagnosed with opioid dependency and other anxiety disorders.   None were
given a medical examination or mental health examination.   All were prescribed massive doses of
Suboxone and Klonopin by defendants ALAN SUMMERS, AZAD KHAN, KEYHOSROW
PARSIA, and other doctors employed by defendant SUMMERS.

## OVERT ACTS

In furtherance of the conspiracy and to accomplish its object, defendants ALAN
SUMMERS, AZAD KHAN, and KEYHOSROW PARSIA committed the following overt acts,
among others, in the Eastern District of Pennsylvania and elsewhere:

1.     On or about April 19, 2011, outside the usual course of professional practice and
not for a legitimate medical purpose, defendant ALAN SUMMERS and another doctor working at
defendant SUMMERS's clinic prescribed an undercover law enforcement officer (hereinafter
"UCA #1") ninety Suboxone 8 milligram film strips and ninety Klonopin 2 milligram pills.

2.     On or about May 29, 2013, defendant KEYHOSROW PARSIA diagnosed
Customer #2 with Generalized Anxiety Disorder, Panic Disorder, Intermittent Explosive Disorder,
Features of PTSD, Bipolar Disorder, and Opiate Dependency without giving Customer #2 a
medical examination or a mental health examination.

-19-

3.      On or about May 29, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant KEYHOWROW PARSIA prescribed Suboxone and Klonopin for Customer #2.

4.      On or about June 17, 2013, defendant ALAN SUMMERS diagnosed Customer #1 with Opiate Dependency, Generalized Anxiety Disorder with Elements of Post-Traumatic Stress Disorder without conducting a medical examination or a mental health examination.

5.      On or about June 17, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant ALAN SUMMERS prescribed Suboxone and Klonopin for Customer #1.

6.      On or about July 16, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant AZAD KHAN prescribed a DEA cooperating defendant (hereinafter Cooperating Defendant #1) twenty-one Suboxone 8 milligram film strips.

7.      On or about July 16, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant ALAN SUMMERS diagnosed Cooperating Defendant #1 with Generalized Anxiety Disorder and Opiate Addiction, without ever seeing Cooperating Defendant #1, and prescribed Cooperating Defendant #1 twenty-one Klonopin 2 milligram pills.

8.      On or about September 24, 2013, defendant AZAD KHAN diagnosed Customer #2 with Opiate Addiction, Anxiety, Depression, and PTSD without conducting a medical examination or mental health examination.

9.      On or about September 24, 2013, defendant AZAD KHAN falsely reported in Customer #1's medical file that: (a) Customer #1 was seeing a psychiatrist; (b) Customer #1 had been educated on the side effects of the Suboxone and Klonopin; and (c) defendant KHAN had given Customer #1 a physical examination.

10.     On or about September 24, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant AZAD KHAN prescribed Customer #2 Suboxone and Klonopin.

11.     On or about September 28, 2013, defendant AZAD KHAN diagnosed Customer #1 with Opiate Addiction, Anxiety, Depression, and PTSD without conducting a medical examination or mental health examination.

12.     On or about September 28, 2013, defendant AZAD KHAN falsely reported in Customer #1's medical file that: (a) Customer #1 was seeing a psychiatrist; (b) Customer #1 had been educated on the side effects of the Suboxone and Klonopin; and (c) defendant KHAN had given Customer #1 a physical examination.

13.     On or about September 28, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant AZAD KHAN prescribed Customer #1 Suboxone and Klonopin.

14.     On or about September 28, 2013, defendant AZAD KHAN diagnosed Customer #4 with Opiate Addiction, Anxiety, Depression, and PTSD without conducting a medical examination or mental health examination.

15.     On or about September 28, 2013, defendant AZAD KHAN falsely reported in Customer #4's medical file that: (a) Customer #4 was seeing a psychiatrist; (b) Customer #4 had been educated on the side effects of the Suboxone and Klonopin; and (c) defendant KHAN had given Customer #4 a physical examination.

16.     On or about September 28, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant AZAD KHAN prescribed Customer #4 Suboxone and Klonopin.

-21-

17.     On or about October 5, 2013, defendant AZAD KHAN diagnosed Customer #2 with Opiate Addiction, Anxiety, Depression, and PTSD without conducting a medical examination or mental health examination.

18.     On or about October 5, 2013, defendant AZAD KHAN falsely reported in Customer #2's medical file that: (a) Customer #2 was seeing a psychiatrist; (b) Customer #2 had been educated on the side effects of the Suboxone and Klonopin; and (c) defendant KHAN had given Customer #2 a physical examination.

19.     On or about October 5, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant AZAD KHAN prescribed Customer #2 Suboxone and Klonopin.

20.     On or about October 12, 2013, defendant AZAD KHAN diagnosed Customer #4 with Opiate Addiction, Anxiety, Depression, and PTSD without conducting a medical examination or mental health examination.

21.     On or about October 12, 2013, defendant AZAD KHAN falsely reported in Customer #4's medical file that: (a) Customer #4 was seeing a psychiatrist; (b) Customer #4 had been educated on the side effects of the Suboxone and Klonopin; and (c) defendant KHAN had given Customer #4 a physical examination.

22.     On or about October 12, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant AZAD KHAN prescribed Customer #4 Suboxone and Klonopin.

23.     On or about October 17, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant KEYHOSROW PARSIA prescribed Cooperating Defendant #1 ninety Suboxone 8 milligram film strips and ninety Klonopin 2 milligram pills.

-22-

24.     On or about October 24, 2013, defendant ALAN SUMMERS diagnosed UCA #1 with Opiate Dependency, Generalized Anxiety Disorder with Elements of Post-Traumatic Stress Disorder without conducting a medical examination or a mental health examination.

25.     On or about October 24, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant ALAN SUMMERS prescribed UCA #1 twenty-one Suboxone 8 milligram film strips and twenty-one Klonopin 2 milligram pills.

26.     On or about October 26, 2013, defendant AZAD KHAN diagnosed Customer #5 with Opiate Addiction, Anxiety, Depression, and PTSD without conducting a medical examination or mental health examination.

27.     On or about October 26, 2013, defendant AZAD KHAN falsely reported in Customer #5's medical file that: (a) Customer #5 was seeing a psychiatrist; (b) Customer #5 had been educated on the side effects of the Suboxone and Klonopin; and (c) defendant KHAN had given Customer #5 a physical examination.

28.     On or about October 26, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant AZAD KHAN prescribed Customer #5 Suboxone and Klonopin.

29.     On or about November 5, 2013, defendant AZAD KHAN diagnosed UCA #1 with Opiate Addiction, Anxiety, Depression, and PTSD without conducting a medical examination or mental health examination.

30.     On or about November 5, 2013, defendant AZAD KHAN falsely reported in UCA #1's medical file that: (a) UCA #1 was seeing a psychiatrist; (b) UCA #1 had been educated on the side effects of the Suboxone and Klonopin; and (c) defendant KHAN had given UCA #1 a physical examination.

31.     On or about November 5, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant AZAD KHAN prescribed UCA #1 ninety Suboxone 8 milligram film strips.

32.     On or about November 5, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant ALAN SUMMERS prescribed UCA #1 ninety Klonopin 2 milligram pills.

33.     On or about November 13, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant ALAN SUMMERS prescribed Cooperating Defendant #1 ninety Klonopin 2 milligram pills, while another doctor working at defendant SUMMERS's clinic under his direction (hereinafter Doctor #1) prescribed Cooperating Defendant #1 ninety Suboxone 8 milligram film strips.

34.     On or about December 7, 2013, defendant AZAD KHAN diagnosed Customer #1 with Opiate Addiction, Anxiety, Depression, and PTSD without conducting a medical examination or mental health examination.

35.     On or about December 7, 2013, defendant AZAD KHAN falsely reported in Customer #1's medical file that: (a) Customer #1 was seeing a psychiatrist; (b) Customer #1 had been educated on the side effects of the Suboxone and Klonopin; and (c) defendant KHAN had given Customer #1 a physical examination.

36.     On or about December 7, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant AZAD KHAN prescribed Customer #1 Suboxone and Klonopin.

37.     On or about December 16, 2013, defendant ALAN SUMMERS diagnosed Customer #5 with Opiate Dependency, Generalized Anxiety Disorder with Elements of

-24-

Post-Traumatic Stress Disorder without conducting a medical examination or a mental health examination.

38.     On or about December 16, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant ALAN SUMMERS prescribed Customer #5 Suboxone and Klonopin.

39.     On or about February 10, 2014, outside the usual course of professional practice and not for a legitimate medical purpose, defendant KEYHOSROW PARSIA prescribed Cooperating Defendant #1 twenty-one Suboxone 8 milligram film strips and twenty-one Klonopin 2 milligram pills.

40.     On or about February 17, 2014, defendant ALAN SUMMERS diagnosed Customer #3 with Opiate Dependency, Generalized Anxiety Disorder with Elements of Post-Traumatic Stress Disorder without conducting a medical examination or a mental health examination.

41.     On or about February 17, 2013, outside the usual course of professional practice and not for a legitimate medical purpose, defendant ALAN SUMMERS prescribed Customer #3 Suboxone and Klonopin.

42.     On or about February 20, 2014, outside the usual course of professional practice and not for a legitimate medical purpose, defendant KEYHOSROW PARSIA prescribed Cooperating Defendant #1 ninety Suboxone 8 milligram film strips and ninety Klonopin 2 milligram pills.

43.     On or about February 20, 2014, outside the usual course of professional practice and not for a legitimate medical purpose, defendant KEYHOSROW PARSIA prescribed an undercover law enforcement officer (hereinafter "UCA #2") twenty-one Suboxone 8 milligram film strips and twenty-one Klonopin 2 milligram pills.

44.     On or about March 15, 2014, defendant ALAN SUMMERS diagnosed Customer #4 with Opiate Dependency, Generalized Anxiety Disorder with Elements of Post-Traumatic Stress Disorder without conducting a medical examination or a mental health examination.

45.     On or about March 15, 2014, outside the usual course of professional practice and not for a legitimate medical purpose, defendant ALAN SUMMERS prescribed Customer #5 Suboxone and Klonopin.

46.     On or about March 29, 2014, outside the usual course of professional practice and not for a legitimate medical purpose, a doctor working at defendant ALAN SUMMERS's clinic under his direction (hereinafter Doctor #2) prescribed an undercover law enforcement officer (hereinafter UCA #3) twenty-one Suboxone 8 milligram film strips and twenty-one Klonopin 2 milligram pills.

47.     On or about March 29, 2014, outside the usual course of professional practice and not for a legitimate medical purpose, a doctor working at defendant ALAN SUMMERS's clinic under his direction (hereinafter Doctor #3) prescribed an undercover law enforcement officer (hereinafter "UCA #2") twenty-one Suboxone 8 milligram film strips and twenty-one Klonopin 2 milligram pills

48.     On or about April 7, 2014, outside the usual course of professional practice and not for a legitimate medical purpose, defendant ALAN SUMMERS prescribed Cooperating Defendant #1 ninety Klonopin 2 milligram pills, while another doctor at defendant SUMMERS's clinic working under his direction (hereinafter Doctor #4) prescribed Cooperating Defendant #1 ninety Suboxone 8 milligram film strips, for which there was no medical necessity for either prescription.

49.     On or about May 21, 2014, defendant ALAN SUMMERS diagnosed UCA #2 with Opiate Dependency, Generalized Anxiety Disorder with Elements of Post-Traumatic Stress Disorder without conducting a medical examination or a mental health examination.

All in violation of Title 21, United States Code, Section 846.

## COUNT TWO

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 30 and 32 through 43 and Overt Acts 1 through 49 of Count One are incorporated here.

2.      The Medicaid Program is a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b), in that it provides payment for health care services on behalf of eligible low-income individuals with limited income.   The Pennsylvania Medicaid Program is jointly funded by the U.S. Department of Health & Human Services and the Commonwealth of Pennsylvania.   The Medicaid Managed Care Organizations include Keystone Mercy/Keystone First, United HealthCare, HealthPartners, Aetna Better Health, and Coventry Cares.

3.      The Medicare program is a "healthcare benefit program" as defined by Title 18, United States Code, Section 24(b) in that it provides healthcare services, including prescription medications.   Individuals are eligible for Medicare benefits if they are 65 or older, have certain disabilities, or have end-stage renal disease.   The Medicare program is funded by the U.S. Department of Health & Human Services, Centers for Medicare and Medicaid Services. Medicare Part D is a federal program enacted as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, effective 2006, to subsidize the costs of prescription drugs for Medicare beneficiaries.   Individuals are eligible for prescription drug coverage under a Part D plan if they are entitled to benefits under Medicare Part A and/or enrolled in Part B.   Beneficiaries can obtain the Part D drug benefit through two types of private plans: they can join a Prescription Drug Plan (PDP) for drug coverage only or they can join a Medicare Advantage plan that covers both medical services and prescription drugs.

-28-

4.      The Blue Cross and Blue Shield Association (BCBSA) is the national coordinating body for the federation of independent Blue Cross and Blue Shield plans. Blue Cross and Blue Shield plans contract with hospitals, physicians, and other health care providers to provide a variety of managed health care service insurance plans, including, insurance coverage for medically necessary prescriptions for their members.   The 38 independent companies that form the BCBSA are among the oldest and largest health insurers in the U.S., collectively covering more than 98 million people.   Independence Blue Cross (IBC) is one of these 38 independent licensees, and has been assigned a specific area to market its products, including, Bucks, Chester, Delaware, Montgomery, and Philadelphia counties in Pennsylvania.

5.      From on or about January 1, 2011, through the date of this indictment, in the Eastern District of Pennsylvania and elsewhere, defendant

**ALAN SUMMERS**

conspired and agreed with others known and unknown to the grand jury to knowingly and willfully execute a scheme to defraud health benefit programs as defined in Title 18, United States Code, Section 24(b), and to obtain money and property of health care benefit programs by means of false and fraudulent pretenses, representations, and promises, in connection with the delivery of and payment for health care benefits, items and services, violation of Title 18, United States Code Section 1347.

## MANNER AND MEANS

It was part of the scheme that:

6.      As described in more detail in Count One, defendant ALAN SUMMERS operated a substance abuse clinic in Philadelphia which illegally distributed controlled substances. Defendant SUMMERS's clinic accepted only cash as payment for the prescriptions, but did accept

health insurance to pay for urine testing.   Defendant SUMMERS's clinic also submitted

pre-authorization forms to customers' insurance companies so that the customers could use

insurance to pay to fill their prescriptions at the pharmacy.   Since many of defendant

SUMMERS's customers received Medicaid benefits from the government, many of defendant

SUMMERS's customers were able to fill their prescription with little or no out-of-pocket

expenses.   Defendant SUMMERS's office manager, a person known to the grand jury,

coordinated the submission of the pre-authorization forms.

       7.    To ensure that his customers received insurance coverage, defendant

ALAN SUMMERS and others knowingly submitted and caused other to submit false information

to the insurance companies.   This false information included assertions that: (1) customers had

been consistently using Suboxone when the laboratory reports showed they had not; (2)

customers' urine tests were negative for the presence of opiates when the laboratory reports

showed they were positive; (3) customers were attending substance abuse counseling when

defendant SUMMERS knew that customers were in fact not attending counseling, (4) customers

were receiving substance abuse therapy from a licensed mental health professional in defendant

SUMMERS's clinic when defendant SUMMERS well knew that the persons he used to lead group

therapy sessions were not licensed and had no training in mental health counseling, and (5) female

customers had received pregnancy tests when defendant SUMMERS well knew that no such tests

were performed.

       All in violation of Title 18, United States Code, Section 1349.

## COUNT THREE

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about July 16, 2013, in Philadelphia, in the Eastern District of Pennsylvania, defendants

**ALAN SUMMERS and
AZAD KHAN**

knowingly and intentionally distributed, and aided and abetted the distribution of, a mixture and substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, also known as Klonopin, a Schedule IV controlled substance, to Cooperating Defendant #1.

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2) and Title 18, United States Code, Section 2.

## COUNT FOUR

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about October 17, 2013, in Philadelphia, in the Eastern District of Pennsylvania, defendants

**ALAN SUMMERS and
KEYHOSROW PARSIA**

knowingly and intentionally distributed, and aided and abetted the distribution of, a mixture and substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, also known as Klonopin, a Schedule IV controlled substance, to Cooperating Defendant #1.

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2) and Title 18, United States Code, Section 2.

## COUNT FIVE

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about October 24, 2013, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### ALAN SUMMERS

knowingly and intentionally distributed, and aided and abetted the distribution of, a mixture and substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, also known as Klonopin, a Schedule IV controlled substance, to an undercover law enforcement officer ("UCA #1").

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2) and Title 18, United States Code, Section 2.

## COUNT SIX

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about November 5, 2013, in Philadelphia, in the Eastern District of Pennsylvania, defendants

**ALAN SUMMERS and
AZAD KHAN**

knowingly and intentionally distributed, and aided and abetted the distribution of, a mixture and substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, also known as Klonopin, a Schedule IV controlled substance, to an undercover law enforcement officer ("UCA #1").

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2) and Title 18, United States Code, Section 2.

## COUNT SEVEN

**THE GRAND JURY FURTHER CHARGES THAT:**

   On or about November 13, 2013, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### ALAN SUMMERS

knowingly and intentionally distributed, and aided and abetted the distribution of, a mixture and substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, also known as Klonopin, a Schedule IV controlled substance, to Cooperating Defendant #1.

   In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2) and Title 18, United States Code, Section 2.

## COUNT EIGHT

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about February 10, 2014, in Philadelphia, in the Eastern District of

Pennsylvania, defendants

### ALAN SUMMERS and
### KEYHOSROW PARSIA

knowingly and intentionally distributed, and aided and abetted the distribution of, a mixture and

substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule

III controlled substance, and a mixture and substance containing a detectable amount of

clonazepam, also known as Klonopin, a Schedule IV controlled substance, to Cooperating

Defendant #1.

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2) and

Title 18, United States Code, Section 2.

## COUNT NINE

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about February 20, 2014, in Philadelphia, in the Eastern District of Pennsylvania, defendants

**ALAN SUMMERS and
KEYHOSROW PARSIA**

knowingly and intentionally distributed, and aided and abetted the distribution of, a mixture and substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, also known as Klonopin, a Schedule IV controlled substance, to Cooperating Defendant #1.

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2) and Title 18, United States Code, Section 2.

## COUNT TEN

**THE GRAND JURY FURTHER CHARGES THAT:**

   On or about February 20, 2014, in Philadelphia, in the Eastern District of

Pennsylvania, defendants

**ALAN SUMMERS and
KEYHOSROW PARSIA**

knowingly and intentionally distributed, and aided and abetted the distribution of, a mixture and

substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule

III controlled substance, and a mixture and substance containing a detectable amount of

clonazepam, also known as Klonopin, a Schedule IV controlled substance to an undercover law

enforcement officer ("UCA #2").

   In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2) and

Title 18, United States Code, Section 2.

## COUNT ELEVEN

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about March 29, 2014, in Philadelphia, in the Eastern District of

Pennsylvania, defendant

### ALAN SUMMERS

knowingly and intentionally distributed, and aided and abetted the distribution of, a mixture and

substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule

III controlled substance, and a mixture and substance containing a detectable amount of

clonazepam, also known as Klonopin, a Schedule IV controlled substance, to an undercover law

enforcement officer ("UCA #3").

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2) and

Title 18, United States Code, Section 2.

## COUNT TWELVE

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about March 29, 2014, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### ALAN SUMMERS

knowingly and intentionally distributed, and aided and abetted the distribution of, a mixture and substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, also known as Klonopin, a Schedule IV controlled substance to an undercover law enforcement officer ("UCA #2").

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2) and Title 18, United States Code, Section 2.

## COUNT THIRTEEN

**THE GRAND JURY FURTHER CHARGES THAT:**

On or about April 7, 2014, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### ALAN SUMMERS

knowingly and intentionally distributed, and aided and abetted the distribution of, a mixture and substance containing a detectable amount of buprenorphine, also known as Suboxone, a Schedule III controlled substance, and a mixture and substance containing a detectable amount of clonazepam, also known as Klonopin, a Schedule IV controlled substance, to Cooperating Defendant #1.

In violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(E), (b)(2) and Title 18, United States Code, Section 2.

## COUNT FOURTEEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1.     Paragraphs 1 through 30 and 32 through 43 and Overt Acts 1 through 49 of Count One are incorporated here.

2.     On or about April 18, 2012, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### ALAN SUMMERS

knowingly conducted a financial transaction affecting interstate commerce, namely, a check in the amount of $2,500 to a construction company to refurbish his medical office.

3.     When conducting this financial transaction, defendant ALAN SUMMERS knew that the property involved in this financial transaction represented the proceeds of some form of unlawful activity.

4.     This financial transaction involved the proceeds of a specified unlawful activity, that is, conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Section 846, and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and defendant ALAN SUMMERS acted with the knowledge that the transaction was designed with the intent to promote the carrying on of the specified unlawful activity.

In violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

## COUNT FIFTEEN

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 30 and 32 through 43 and Overt Acts 1 through 49 of Count One are incorporated here.

2.      On or about March 24, 2012, in Philadelphia, in the Eastern District of Pennsylvania, defendant

**ALAN SUMMERS**

knowingly conducted a financial transaction affecting interstate commerce, namely, a check in the amount of $4,000 to a construction company to refurbish his medical office.

3.      When conducting this financial transaction, defendant ALAN SUMMERS knew that the property involved in this financial transaction represented the proceeds of some form of unlawful activity.

4.      This financial transaction involved the proceeds of a specified unlawful activity, that is, conspiracy to distribute controlled substances, in violation of Title 21, United States Code, Section 846, and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1), and defendant ALAN SUMMERS acted with the knowledge that the transaction was designed with the intent to promote the carrying on of the specified unlawful activity.

In violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

## COUNT SIXTEEN AND SEVENTEEN

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.     Paragraphs 1 through 30 and 32 through 43 and Overt Acts 1 through 49 of Count One are incorporated here.

      2.     From on or about January 1, 2011 through the date of this indictment, in Philadelphia, in the Eastern District of Pennsylvania, defendant

### ALAN SUMMERS

knowingly and willfully executed, and aided and abetted the execution of, a scheme and artifice to defraud a health care benefit program, that is, Keystone Mercy/Keystone First, United HealthCare, HealthPartners, Aetna Better Health, Coventry Cares, and Independence Blue Cross, and to obtain money and property owned by and under the custody and control of that health care benefit program, by means of false and fraudulent pretenses, representations, and promises, in connection with the delivery of/payment for health care benefits, items and services, by providing false information on pre-authorization forms for customers seeking health care benefits for prescriptions for Suboxone and Klonopin which were issued outside the usual course of professional practice and not for a legitimate medical purpose, on or about the dates below, each date constituting a separate count:

| Count | Approximate Date of Pre-Authorization Submission | Customer | Health Care Benefit Program |
|-------|--------------------------------------------------|----------|------------------------------|
| 16 | May 30, 2013 | Customer #5 | Keystone First |
| 17 | December 16, 2013 | Customer #5 | Keystone First |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## NOTICE OF FORFEITURE No. 1

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.     As a result of the violations of Title 21, United States Code, Sections 846 and 841(a)(1) as set forth in this indictment, defendant

**ALAN SUMMERS,**
**AZAD KHAN, and**
**KEYHOSROW PARSIA**

shall forfeit to the United States of America:

      (a)     any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense;

      (b)     any property constituting, or derived from, proceeds obtained directly or indirectly from the commission of such offenses, including, but not limited to, the sum of $5,033,187.49.

      2.     If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

      (a)     cannot be located upon the exercise of due diligence;

      (b)     has been transferred or sold to, or deposited with, a third party;

      (c)     has been placed beyond the jurisdiction of the Court;

      (d)     has been substantially diminished in value; or

      (e)     has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property subject to forfeiture.

      All pursuant to Title 21, United States Code, Section 853.

-45-

<u>**NOTICE OF FORFEITURE No. 2**</u>

**THE GRAND JURY FURTHER CHARGES THAT:**

         1.      As a result of the violation of Title 18, United States Code, Section 1956 set forth in this indictment, defendants

**ALAN SUMMERS,**
**AZAD KHAN, and**
**KEYHOSROW PARSIA**

shall forfeit to the United States of America any property, real or personal, involved in such violation, and any property traceable to such property.

         2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

         (a)      cannot be located upon the exercise of due diligence;

         (b)      has been transferred or sold to, or deposited with, a third party;

         (c)      has been placed beyond the jurisdiction of the Court;

         (d)      has been substantially diminished in value; or

         (e)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property subject to forfeiture.

         All pursuant to Title 18, United States Code, Section 982.

## NOTICE OF FORFEITURE No. 3

**THE GRAND JURY FURTHER CHARGES THAT:**

      1.     As a result of the violations of Title 18, United States Code, Sections 1347 and 1349 as set forth in this indictment, defendants

**ALAN SUMMERS,
AZAD KHAN, and
KEYHOSROW PARSIA**

shall forfeit to the United States of America any property that constitutes or is derived from gross proceeds traceable to the commission of such offenses.

      2.     If any of the property subject to forfeiture, as a result of any act or omission of the defendant(s):

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the Court;

        (d)     has been substantially diminished in value; or

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant(s) up to the value of the property subject to forfeiture.

      All pursuant to Title 18, United States Code, Section 982(a)(7).

**A TRUE BILL:**

_____
**GRAND JURY FOREPERSON**

_____
**ZANE DAVID MEMEGER**
**United States Attorney**